I ¶ARMSTRONG, Judge.
In this case, the biological father of a child, who is not and never has been married to the child’s mother, and who is not the legal father of the child, seeks judicial recognition of his paternity, joint custody, and visitation. The mother and the child’s legal father are divorced and custody of the child is the subject of a decree in their domestic action. The biological father brought this action as an intervention in the domestic proceeding of the mother and the legal father. Both the mother and the legal father oppose the biological father’s action on the ground, among others, that it was brought untimely.[1]
The trial court, among other things, recognized the biological paternity alleged and held that the biological father’s action was not untimely. The mother and the legal father appeal the trial court’s holding that the biological father’s action was not untimely. They do not appeal the trial court’s finding of biological paternity. We conclude that, because the biological father waited more than six|2years to bring his action, that his action was brought untimely and so we render judgment dismissing it.
The mother and the biological father met in October 1985. At that time the mother was married to and living with the legal father. The biological father also was married and was living with his wife. The mother and the biological father began a sexual relationship in March or April of 1986 which relationship continued for some years. In *731 March 1988, the mother and the biological father found out that she was pregnant. At that time, the biological father urged the mother to have an abortion.
The biological father testified that, from the time he learned the mother was pregnant, he suspected that he was the father. The mother testified that the biological father was forceful in his assertion that he was the father because he knew that she, the mother, had not been intimate with her husband, the legal father, for a three week period during the time of the conception.
The child was born in December 1988. The biological father testified that he continued to see the mother, and the child, and was always suspicious that he was the child’s father. A lifelong friend of the biological father testified that, during this period, the biological father told him of having a strong feeling that he was the father. The friend also testified that, beginning as early as 1991, there was an ongoing discussion of the biological father with him as to whether the biological father should go to court to establish his paternity.
In November 1992, the mother and the legal father began living separate and apart. The biological father also left his wife at that time. Because of divorce, custody and community property proceedings between the mother and the legal father, and at the request of the mother, the biological father stayed away for some Rtime. However, in March 1993, with the domestic proceedings of the mother and the legal father still pending, but believing that the legal father was aware of the biological father’s relationship with the mother, the biological father began to visit the child, although these visits were not known of by the legal father.
In April 1993, the mother, the biological father and the child had blood work done for a DNA paternity test. The test results were received by the mother and the biological father in June 1993 and confirmed the biological father’s paternity. The legal father was not aware of the DNA test or its results.
The mother and the legal father were divorced in June, 1993. There was a child custody hearing in August 1993, the mother and the legal father were awarded joint custody, the mother was made the principal domiciliary parent, and the legal father was granted visitation.
In November 1993, the relationship between the mother and the biological father terminated. In January 1994, there was a meeting of the mother and the biological father at the office of the mother’s attorney to discuss some arrangement as to the child. No agreement was reached.
In November 1994, the mother filed a petition for a temporary restraining order and injunctive relief against the biological father alleging that, in 1993 and 1994, he constantly had telephoned her, stalked her, verbally and physically attacked her and threatened her. A consent judgment was entered creating reciprocal injunctions directed to the mother and the biological father prohibiting harassment or contact between them. In December 1994, the biological father filed a petition in intervention in the domestic ease between the mother and the legal father. The petition in intervention sought recognition of biological paternity, joint custody and visitation.
|4The biological father’s action is of a type not provided for by the Civil Code, but recognized in the caselaw, and referred to as an “avowal action”. Demery v. HANO, No. 96-CA-1024 (La.App. 4th Cir. 2/12/97), 689 So.2d 659, 666; Smith v. Dison, No. 95-CA-0198 (La.App. 4th Cir. 9/28/95), 662 So.2d 90, 94; Geen v. Geen, No. 95-985 (La.App. 3rd Cir. 12/27/95), 666 So.2d 1192, 1194, writ denied, 96-C-0201 (La.3/22/96), 669 So.2d 1224; Smith v. Jones, 566 So.2d 408, 413 (La.App. 1st Cir.), writ denied, 569 So.2d 981 (La.1990); Finnerty v. Boyett, 469 So.2d 287, 296 (La.App. 2nd Cir.1985). See also Smith v. Cole, 553 So.2d 847, 854 (La.1989).
The mother and the legal father, who argue that the biological father’s action was brought untimely, concede that there is no prescription statute applicable. “[TJhere is no statutory prescriptive period for [an] avowal action[.J” Smith v. Dison, 95-CA-0198 (La.App. 4th Cir. 9/28/95), 662 So.2d 90, 94 n. 2. Accord Putnam v. Mayeaux, 93-CA-1251 (La.App. 1st Cir. 11/10/94), 645 So.2d 1223, 1226-27 (“[TJhere is no applicable prescriptive period for an avowal action.”).
*732 However, the mother and the legal father point out that the caselaw recognizing avowal actions also requires that such actions be brought promptly. “A biological parent who knows of the existence of his biological child and who fails to assert his rights for a significant amount of time, cannot come forward later and assert paternity.” Demery v. HANO, 96-CA-1024 (La.App. 4th Cir. 2/12/97), 689 So.2d 659, 666. “[A] biological father, who knows or has reason to know of the existence of his biological child and who fails to assert his right for a significant period of time, cannot later come forward and assert paternity.” Smith v. Dison, No. 95-CA-0198 (La.App. 4th Cir. 9/28/95), 662 So.2d 90, 94 n. 2 (emphasis added). Accord Smith v. Jones, 566 So.2d at 415; Putnam, 645 So.2d at 1225-26; Geen, 666 So.2d at 1194. “For obvious reasons, the greater the period of time which elapses from the child’s birth to the bringing of the action, the less favorably such an action should be viewed.” Finnerty, 469 So.2d at 296.
The mother and the legal father, pointing out the obvious potential for trauma to the child from inserting a new “father” into the life of a child with an existing paternal relationship established for over six years, argue that the biological father’s six year delay makes the doctrine of laches applicable in this case. We agree. Because the biological father’s six year delay has caused prejudice in the form of potential harm to the child, the biological father’s avowal action is barred by laches.
“The doctrine of laches is used to bar prosecution of stale and antiquated demands which would cause injustice if pursued.” Bailey v. State of Louisiana, 623 So.2d 704, 706 (La.App. 4th Cir.1993). Accord Barnett v. Develle, 289 So.2d 129, 139 (La.1974).
It is difficult to state the elements of lach-es or to state a “test” for the application of laches. In general, since the applicability of laches is within the discretion of the court, each case rests upon its own particular set of circumstances. It is possible to say that laches has no application where there has been no delay in asserting the right. However, delay of time alone will not suffice, there must be other circumstances. Prime among the other circumstances most often mentioned in the jurisprudence are a prejudicial change of conditions occurring during the delay and reliance by the defendant upon the inaction of the plaintiff. Munson v. Martin, 249 La. 925, 192 So.2d 126 (1966); Labarre v. Rateau, (210 La. 34, 26 So.2d 279), supra; Shirey v. Campbell, (La.App., 151 So.2d 557) supra; 30A C.J.S. Equity ss 115 — 119.
Molero v. Bass, 322 So.2d 452, 454 (La.App. 4th Cir.1975), writ denied, 325 So.2d 609 (La.1976). Accord Fontenot v. State, Dept. of Public Safety, 341 So.2d 80 (La.App. 3rd Cir.1976) (quoting above-quoted passage from Molero). ^Despite the just-cited case-law, and many similar decisions, there is some uncertainty as to whether the doctrine of laches continues to exist in Louisiana law. As will be discussed in detail below, one possible view is that laches can apply only in situations, such as the present one, in which there is no applicable prescription statute. The other possible view is that laches cannot, under any circumstances, be applied in Louisiana law.
The uncertainty has its origins in one of the Official Revision Comments to Article 3457 of the Civil Code. The text of Article 3457 itself states in its entirety: “There is no prescription other than that established by legislation.” This text, by itself, does not bar the courts from creating and applying the doctrine of laches, because the Article speaks only of “prescription” and, as explained in Molero, prescription and laches are not synonymous. Prescription bars actions due to the passage of time alone. Laches bars actions due to passage of time plus the existence of other circumstances such as prejudice from the delay. Molero, supra. However, Official Revision Comment (b) to Article 3457 states: “Under the Louisiana legal system, there is no room for the common law doctrine of laches.” The only authorities the Comment cites for this proposition are two federal district court decisions from 1944. In fact, the doctrine of laches has a very long history of not infrequent application in Louisiana law. See Vernon Palmer, The many Guises of Equity In A *733 mixed Jurisdiction: A Functional View of Equity In Louisiana, 69 Tul. L.Rev. 7, 61-64 (1994). While laches has had frequent application in cases involving public bodies as defendants, because such bodies run their financial affairs on a fiscal year basis, id., laches has not been confined to cases involving public bodies or public funds. E.g., Molero, supra.
In Corbello v. Sutton, 446 So.2d 301 (La.1984), the trial court and the court of appeal had both held that a suit seeking review of an order of the Commissioner of Conservation should be dismissed on grounds of lach-es. The Supreme Court upheld the dismissal, not on grounds of laches, but because it determined that there was an applicable prescription statute that had run and which barred the action. The Supreme Court stated:
The delay provisions of the Administrative Procedure Act (APA), R.S. 49:950-:970 do not necessarily apply to actions for judicial review brought pursuant to the Conservation Act. The APA provides, in the absence of a contrary provision, that a petition for judicial review of administrative orders must be filed within thirty days of the issuance of the order. APA § 964(B). Thus, in no event, whenever an administrative order is issued, is there an absence of statutory provision for the time delays within which the petition must be filed. The equitable doctrine of laches, therefore, has no application in such cases.
Corbello, 446 So.2d at 302 (emphasis added). The clear import of the just-quoted passage of Corbello is that, when there is ¿n applicable prescription statute, laches cannot apply. Also, there is at least some implication of the converse proposition: That when there is not any applicable prescription statute, laches can apply. On the other hand, immediately after the above-quoted passage from Corbel-lo, the Supreme Court went on to quote in full the entirety of Article 3457 and Comment (b) thereto. Although the Corbello opinion says nothing about the quoted Article and its Comment (b), the quotation could be taken as approval of Comment (b).
In Picone v. Lyons, 601 So.2d 1375 (La.1992), the Supreme Court addressed the issue of whether a long-delayed suit, which was not barred by applicable prescription statutes, nevertheless was barred because the delay constituted a denial of Due Process. As part of a general discussion of the nature and operation of prescription, the Pi-cone opinion quotes in full Article 3457 (but |8not Comment (b) thereto) and then makes its only reference to laches: “The common law doctrine of laches does not prevail in Louisiana and the legislature may create, shorten, lengthen, or abolish prescriptive periods at its discretion.” Id (emphasis added). The focus on the legislative prerogative in the emphasized portion of the just-quoted passage can be read as indicating that the doctrine of laches “does not prevail in Louisiana” in situations in which there is an applicable prescription statute. In other words, as to situations for which the legislature has specified the time period for the bringing of an action, the courts may not shorten that time period by application of laches. On the other hand, the just quoted passage from Picone could be taken more literally as holding that laches can never, under any circumstances, apply in Louisiana law.
In Dubuclet v. St. Paul Fire and Marine Ins. Co., No. 94-CA-0708 (La.App. 4th Cir. 12/15/94), 647 So.2d 1344, the situation was exactly analogous to that in the Supreme Court’s Picone decision and we simply followed Picone. Thus, Picone was not extended in Dubuclet. See also Hendee Homes, Inc. v. Lee, 614 So.2d 733, 735 (La.App. 5th Cir.) (in case with applicable prescription statute, court cites Picone and holds laches inapplicable), writ denied, 616- So.2d 707 (La.1993).
In Benoit v. Devillier, 649 So.2d 523, 527 (La.App. 3rd Cir.1994), writ denied, 650 So.2d 243 (La.1995), the Third Circuit distinguished Corbello, Picone and Hendee on the ground that, in each of these cases, there was an applicable prescription statute. Presumably, the Benoit court would have distinguished Dubuclet on the same basis. The Benoit court affirmed dismissal of an action based on laches (which the Benoit court preferred to refer to as “equity”) because, in that case, there was no applicable prescription statute:
*734 . ^Initially, Benoit argues that the doctrine of laches does not exist in Louisiana. We disagree.
LSA-C.C. Art. 4 provides:
“When no rule for a particular situation can be derived'from legislation or custom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and prevailing usages.”
Article 4 establishes that it is only in instances where legislation or custom are silent that the trial court may permissibly resort to equity as the basis for its decision. It is on this basis that we distinguish the cases [Corbello, Picone and Hendee ] Benoit cites in-support of his position that the common law doctrine of laches does not exist in Louisiana.
Benoit, 649 So.2d at 526-27. See also Barnett v. Develle, 289 So.2d 129, 139 (La.1974) (“The doctrine of laches is predicated upon equity”).
We agree with Benoit. As we have explained above, the text of Article 3457 does not bar the application of laches because the Article deals with prescription and prescription and laches are not synonymous. Comment (b) to Article 3457 does not reflect the body of Louisiana laches caselaw predating the 1982 revision of the Article. Thus, it seems to contradict Comment (a) to the same Article which states that the revised Article “does not change the law”. In any case, Section 6 of Acts 1982, No. 187, which enacted the revision, provides that the Comments are not enacted and are not part of the law. When addressing a similar situation in which a Comment seemed to contradict the text of the statute itself, and in which the Act enacting the statute stated that the Comments were not enacted and were not part of the law, the Supreme Court stated that the Comments “have no legislative effect because they are not part of the law.” Ramirez v. Fair Grounds Corp., 575 So.2d 811, 813 (La.1991). Further, because the statute was clear and unambiguous, the Ramirez court stated that “there is no justification | ipfor our considering the comments even as persuasive sources or interpretive aids.” Id (citing La. Civ.Code art. 9). Similarly, we find that Article 3457 is clear and unambiguous as to its addressing prescription and not laches so there is no justification for considering Comment (b) to that Article as a persuasive source or interpretive aid.
The Corbello and Picone Supreme Court decisions dealt with situations in which there were applicable prescription statutes and can be reasonably read as limited to such situations. Cf. Palmer, 69 Tul. L.Rev. at 63 n. 229 (“It will be interesting to observe if these declarations [of Corbello and Picone ] will also be applied to situations in which prescription has not been established by the legislature [.]”). In light of the courts’ Article 4 duty to proceed in accordance with equity in the absence of legislation or custom (“bound to proceed according to equity” (emphasis added)), and in light of the Supreme Court’s having linked laches and equity, Barnett, 289 So.2d at 139 (“laches is predicated on equity”), it seems unlikely that the Supreme Court meant to do away with the equitable doctrine of laches as to situations in which there is not an applicable prescriptive statute. There are situations in which, to allow an action with no applicable prescription statute to be brought no matter how long the delay, and regardless of the prejudice resulting from that delay, would be a gross departure from equity.
If the Supreme Court were to sweep away more than a century and a half of Louisiana laches caselaw, see Palmer, 69 Tul. L.Rev. at 61 and n. 215, it seems unlikely that it would do so with a single sentence in an opinion devoted to constitutional issues as in Picone or in an uneommented-upori quotation of a Comment which is not part of the law as in Corbello. In the absence of more | udear-cut direction from the Supreme Court, we will not presume such an upheaval in long-established law.
Turning to the application of laches in the present case, we note that: “Laches is an equitable doctrine and thus within the sound discretion of the court.” Molero, 322 So.2d at 454. Accord Gaudet v. City of Sulphur Municipal Police and Fire Civil Service Board, 497 So.2d 63, 65 (La.App. 3rd Cir.1986); Hartman Enterprises, Inc. v. Ascension-St. James Airport and Transportation *735 Authority, 582 So.2d 198, 201 n. 1 (La.App. 1st Cir.), unit denied, 582 So.2d 195 (La.1991).
However, we believe that, in the course of exercising its discretion, the trial court, not having the benefit of significant guidance from the existing caselaw, applied the wrong legal standard to the issue of whether the biological father’s suit was brought timely. As to that issue, the trial court stated:
It is extremely unfortunate that this court is called upon to rule on the issues presented herein. Especially when one considers the potential effects on a child [of this] age learning that [the legal father] is not his biological father. This father [the legal father] and [child] seem to have a very strong and close bond. While these issues should have been addressed by the parties far earlier than now, [the biological father’s] actions are not untimely. Apparently his suspicions of parenthood were not confirmed until he received the results of the tests performed by Gentest.
Reasons for Judgment at 1 (emphasis added) (Aug. 25, 1995). We believe that there are two problems with this reasoning.
First, it appears that the trial court measured the delay involved only from the June 1993 date that the DNA test results “confirmed” the biological father’s by then more than five year old “suspicions” that he was the father. In effect, that more than five years of delay simply “didn’t count” in the trial court’s analysis. | i2But, the biological father’s “suspicions”, which began as soon as he learned the mother was pregnant, were both strongly held and reasonably grounded. He knew that the mother had not been intimate with her husband, the legal father, in the three week period of the conception. He told his lifelong friend that he had a strong feeling that he, the biological father, was the father. He even discussed with his friend the possibility of taking legal action to assert his paternity years before actually doing so. The biological father knew more than enough to file an avowal action. Cf. Smith v. Dison, 662 So.2d at 94 n. 2 (biological father who has “reason to know” of biological child may not delay for a significant period). Further, in connection with that avowal action, he could have sought (and most probably obtained) court-ordered paternity blood testing pursuant to La. R.S. 9:396. See Smith v. Jones, 566 So.2d at 414, 415; Putnam, 645 So.2d at 1226. See also In re J.M., 590 So.2d 565, 571 (La.1991) (court-ordered blood testing obtainable if it is shown that there is a “reasonable possibility of paternity”).
Second, the trial court’s decision gave no weight to the prejudice, in the form of potential harm to the child, when deciding the timeliness issue. Although the trial court expressly noted the “potential effects” upon the child, it did not take that into account as to the timeliness issue. We believe that, instead, it is necessary to measure the extent of the delay in terms of the prejudice created. Because the delay in this case created the prejudice in the form of potential harm to the child, it is “significant.” Demery, 689 So.2d at 666; Smith v. Dison, 662 So.2d at 94 n. 2.
Because the delay in this case was quite lengthy, more than six years, and because it caused prejudice, the biological father’s avowal action is barred by laches.
| igFor the foregoing reasons, we reverse the judgment of the trial court and render judgment dismissing the biological father’s petition in intervention.

REVERSED AND RENDERED.

BYRNES, J., concurs with reasons.
JONES, J., concurs in the result.
MURRAY, J., dissents with reasons.

. In the caption, we have substituted initials for the names of the parties to protect the privacy of the minor child involved and that of the parties.